

**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

_____
**Signed September 7, 2018**                  **United States Bankruptcy Judge**

_____

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § § § § § § § § § | BANKR. CASE NO. 16-34855-BJH (CHAPTER 11) |
| DEPENDABLE AUTO SHIPPERS, INC., | | |
| DEBTOR. | | |
| _____ | § § | |
| DANIEL J. "CORKY" SHERMAN, LIQUIDATING TRUSTEE OF THE DAS LIQUIDATING TRUST, | § § § § | ADV. PROC. NO. 17-3086  Related to ECF Nos. 51 & 53 |
| PLAINTIFF, v. | § § § § | |
| TBK BANK, SSB f/k/a TRIUMPH SAVINGS BANK, SSB d/b/a TRIUMPH COMMERCIAL FINANCE; and SCHIFF HARDIN, LLP, | § § § § § | |
| Defendants. | § | |

**<u>MEMORANDUM OPINION</u>**

I.   PRELIMINARY MATTERS: EVIDENCE CONSIDERED ................................ 4

II.  FACTUAL AND PROCEDURAL HISTORY ..................................................... 6

   A.   *Events Leading to DAS's Bankruptcy and the Need for Additional Funding* 7

   B.   *The ADESA Agreement to Finance DAS Post-Petition* ................................. 8

   C.   *The Trustee Sues to Avoid DAS's Prepetition Transfers to the Defendants* 10

III. JURISDICTION AND VENUE ........................................................................ 11

IV.  SUMMARY JUDGMENT STANDARD ............................................................ 11

V.   LEGAL ANALYSIS ......................................................................................... 12

   A.   *To Avoid a Transfer Under §§ 547 or 548, the Transfer Must Be "of an Interest of the Debtor in Property"* .................................................................... 12

   B.   *The Defendants' Earmarking Defense Bars the Trustee's Avoidance Actions* 14

      1.   *The ADESA Funds were not "an interest in property" of DAS* ...................... 14

      2.   *DAS did not have control over the ADESA Funds* ........................................... 15

         a.   *The ADESA Agreement Obligated DAS to Transfer the ADESA Funds to TBK and Pay Off Its Debt* ............................................................................ 19

         b.   *Possession alone does not establish "control" for purposes of the earmarking doctrine* ................................................................................... 20

   C.   *Hypothetical Liquidation Analysis Under § 547(b)* ...................................... 21

      1.   *TBK's claim against DAS was fully secured* .................................................. 21

VI.  CONCLUSION ................................................................................................ 25

Plaintiff/Trustee Daniel J. Sherman ("**Trustee**") moved for partial summary judgment against defendants TBK Bank, SSB f/k/a Triumph Savings Bank, SSB d/b/a Triumph Commercial Finance (collectively "**TBK**") and Schiff Hardin, LLP ("**Schiff**" and, together with TBK, the "**Defendants**"). The Trustee challenges pre-bankruptcy transfers[1] to the Defendants as preferences or fraudulent transfers avoidable under 11 U.S.C. §§ 547(b) and 548(a)(1). He also contests the Defendants' use of the earmarking defense. Defendants cross-moved for summary judgment, arguing that the disputed transfers are not recoverable under either Bankruptcy Code provision because (i) the earmarking defense meant the transferred funds were not property of Dependable Auto Shippers, Inc. ("**DAS**"), which later filed chapter 11; and (ii) the transfers did not "enable the Defendants to receive more than they would otherwise have received if the transfer had not been made and the case had proceeded under Chapter 7," an essential element of both §§ 547(b) and 548(a)(1) avoidance claims.

The Defendants are entitled to summary judgment and the Trustee's motion for partial summary judgment will be denied.

## I. PRELIMINARY MATTERS: EVIDENCE CONSIDERED

The Trustee filed an extensive objection[2] to the Defendants' evidence in support of their motion, chief among which was the claim that the parol evidence rule precludes consideration of extrinsic evidence concerning the agreements underlying the challenged transactions. The Trustee argues that the loan documents themselves, which incorporate merger clauses, and the arguable

---

[1] The Trustee's motion acknowledged an additional $20,809.08 transfer to TBK on October 3, 2016; however, this transfer preceded the debtor's loan from ADESA and so is not subject to the earmarking defense. Trustee's Motion for Summary Judgment [AP No. 51] at 2 n.2.

Citations to "BC No. __" refers to documents filed in DAS's underlying bankruptcy case, while citations to "AP No. __" refers to documents filed in the adversary proceeding.

[2] The Trustee's evidentiary objection [AP No. 63] (the "**Trustee's Objection**") urged thirty-seven separate objections, which are referred to in numerical order in this Memorandum Opinion.

absence of a provision explicitly earmarking the transferred funds for payment of TBK, preclude consideration of extrinsic evidence.[3]

The Defendants respond that undefined terms rendered the documents ambiguous and that parol evidence is essential to determine the parties' true intentions concerning the challenged transfers.

Two capitalized but undefined terms—"Debt to be Repaid" and "Loan Parties"—appeared in the loan documents[4] and left the credit agreement between ADESA and DAS ambiguous.[5] The terms are subject to more than one interpretation that would substantially alter the terms of the transactions and outcome of this proceeding. The inquiry therefore cannot be limited solely to the four corners of the loan documents:[6] examination of the Defendants' parol evidence was necessary to determine the parties' intentions when they signed the documents. *See Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983) (citing *R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex. 1980) ("Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered.")); *Northeast National Bank v. Tillotson*, 12 B.R. 124, 125 (Bankr. N.D. Tex. 1981) (parol evidence is admissible for the purpose of ascertaining the parties' real intention if a contract is ambiguous).

---

[3] *See* Trustee's Exs. A-E [AP No. 51-1]. Because the Trustee's appendix was not numbered, all citations to the Trustee's exhibits correspond to AP No. 51-1. This opinion will refer to the Trustee's appendix only by exhibit letter.

[4] *See e.g.*, Defendants' App. Tab 2, Ex. 2, ¶¶ 9.1(e), 10.1.

[5] The circumstances in which they were prepared perhaps explain the documents' shortcomings. The Trustee's counsel even conceded at the hearing that the documents were drafted under distressed circumstances in the few days before DAS filed bankruptcy.

[6] *See e.g.*, *Richland Plantation Co. v. Justiss–Mears Oil Co.*, 671 F.2d 154, 156 (5th Cir.1982) (for an ambiguity to exist, more than conflicting interpretations must exist; such interpretations must both be reasonable); *In re Las Torres Dev., L.L.C.*, 408 B.R. 876, 882–83 (Bankr. S.D. Tex. 2009) (when documents cannot be ascertained from their plain language, the court may apply applicable rules of contract construction and, if the document is still ambiguous, the court may look to extrinsic evidence to resolve the ambiguity) (internal citations omitted).

Accordingly, Trustee's Objections Nos. 4-37 were overruled at trial after which the Defendants introduced evidence—deposition testimony, electronic mail and bank statements—to support their contention that the disputed funds were designated ("earmarked") to satisfy TBK's debt as a condition precedent to DAS's receipt of the rest of the ADESA loan proceeds.

The few remaining evidentiary objections, all of which relate to the Declaration of James B. Allin, TBK's Senior Vice President,[7] are easily dealt with. Trustee's Objection No. 1[8] to paragraph 11 of the Allin Declaration is overruled because the statement does not violate the parol evidence rule, is not hearsay, and the Allin Declaration establishes that it was made with personal knowledge.[9] Trustee's Objection No. 2 to a portion of paragraph 12 of the Allin Declaration is sustained. The statement is inadmissible hearsay and the declaration does not demonstrate the basis for the declarant's personal knowledge. Finally, Trustee's Objection No. 3[10] is overruled because the statement does not violate the parol evidence rule and was based on personal knowledge.

## II.    FACTUAL AND PROCEDURAL HISTORY

DAS was a vehicle transport company that contracted both with individuals and with corporate customers. It filed chapter 11 on December 21, 2016 (the "**Petition Date**").[11] The court

---

[7] His declaration (the "**Allin Declaration**") is Defendants' App. Tab 1.

[8] Objection No. 1 concerned paragraph 11 of the Allin Declaration, which states: "On or about November 2016, TBK was requested to enter into a subordination agreement with ADESA, Inc. ("ADESA"). After multiple attempts at reaching an agreement, TBK was advised through its counsel, on or about November 30, 2016, that ADESA would be funding DAS for the purpose of paying off all obligations due and owing by DAS to TBK in exchange for TBK releasing its first priority security interest in the Collateral." Trustee's Objection at 7 of 18.

[9] The Allin Declaration supports his knowledge of the facts cited within his declaration found in Defendants' Allin Declaration, pp. 2-6 of 83.

[10] Objection No. 3 referred to paragraph 13 of the Allin Declaration, which states: "It was TBK's understanding that ADESA would be lending money to DAS for the purpose of paying off all of DAS's obligations to TBK under the Factoring Agreement; TBK was simply awaiting a request for a payoff letter and a wire transfer from DAS." Trustee's Objection at 8 of 18.

[11] [BC No. 1].

eventually confirmed DAS's Fourth Amended Plan of Liquidation,[12] which provided for selection of a liquidating trustee whose duties included investigating and pursuing the estate's claims and causes of action, including avoiding actions under chapter 5 of the Bankruptcy Code.[13] The Trustee later sued the Defendants to avoid DAS's pre-bankruptcy transfers to them under Bankruptcy Code §§ 547 and 548(a)(1)(B).

Individual customers paid DAS when they hired the company to transport their vehicles but the debtor would bill corporate customers, issuing invoices payable within thirty days.[14] This dispute centers on DAS's pre-bankruptcy use of its corporate accounts receivable to obtain money to run its business.

### A. Events Leading to DAS's Bankruptcy and the Need for Additional Funding

The economic downturn in 2009 led to a significant decline in DAS's revenues. DAS required additional funding so it pursued investors to fund approximately $5.3 million in senior secured notes. DAS also entered into a factoring agreement (the "**Factoring Agreement**")[15] and loan and security agreement[16] with TBK. The Factoring Agreement provided that TBK would buy DAS's client accounts by advancing 90% of the face amount of its billed accounts receivable and 85% of its non-billed accounts. *Id.* The Factoring Agreement also prescribed a factoring fee, established reserves and granted TBK a security interest in DAS's "accounts, chattel paper, deposit accounts, inventory and other goods, instruments, investment property, documents, letters of credit rights, commercial tort claims, and general intangible, whether now owned or hereafter acquired,

---

[12] [BC No. 190].

[13] [BC No. 189] ¶ ¶ 1.2.10, 5.1.1, 5.3.1. 5.3.3.

[14] Defendants' App. Tab 2, at 30:21-31:16.

[15] See Trustee's Ex. A; Defendants' App. Tab 1, Exs. A, B.

[16] Defendants' App. Tab 1, Ex. G, H.

including all products and proceeds thereof" to secure its obligations.[17]  Dependable also agreed to pay TBK's legal fees, including fees related to enforcing the Factoring Agreement or any insolvency proceeding commenced by DAS.[18]

The day DAS filed chapter 11 it owed TBK $755,906.00, comprising $706,268.37 for purchased accounts[19] and $15,000 in legal fees owed to Schiff, TBK's counsel.  DAS's accounts receivable aging report reflected total outstanding accounts receivable of $1,035,662.25 as of December 19, 2016,[20] two days before the company filed chapter 11.

When the additional funding proved insufficient due to unanticipated accounting errors related to DAS's expenses, a steady decline in its revenue and its increased debt, equity holders infused an additional $3 million with the intention of luring significant corporate accounts back to DAS.  Unfortunately, DAS's top ten largest corporate accounts suspended service in early April and May 2016, resulting in the company's loss of more than 80% of the prior year's revenue and leaving DAS unable to sustain its debt load.

### B.  The ADESA Agreement to Finance DAS Post-Petition

When it became apparent that DAS's business was declining, its vice president, Timothy Higgins, contacted one of the company's largest vendors, ADESA, Inc. ("**ADESA**") a/k/a KARS Arrive,[21] to discuss a sale of the DAS's consumer division to allow DAS to focus on its corporate business.[22]  Their negotiations did not lead to a sale; instead, ADESA agreed to loan DAS enough

---

[17] Defendants' App. Tab 1, ¶ 7, 8; Ex. B.  The Trustee and Defendants stipulated that as of the date of the Transfers, TBK held a senior first priority security interest in DAS's accounts and general intangibles.  Defendants' App. Tab 4.

[18] See Trustee's Ex. A ¶ 18.

[19] *See* Allin Declaration ¶ 10; *see also* Defendants' App. Tab 1, Ex. C.

[20] Defendants' App. Tab 32.

[21] KAR Holdings, Inc., later known as KAR Auction Services, Inc. acquired ADESA in April 2017.  *See* Defendants' App. Tab 3 ¶ 26; Tab 7.

[22] Defendants' App. Tab 3 ¶ 22; Tab 6.

to satisfy its debt to TBK under the Factoring Agreement and to cover other expenses.[23] The parties structured the deal as a loan to provide ADESA additional protection, anticipating that DAS would file for bankruptcy and ADESA would become its post-petition financier.[24] Specifically, ADESA would provide the initial funding *before* DAS filed bankruptcy and subject to some conditions, would extend additional funding *after* bankruptcy.[25] The parties also understood that subordinating all other debt to ADESA's was essential to protect ADESA from the risks associated with being the post-petition financier.

Communications among ADESA, DAS and TBK reflect the parties' understanding that ADESA's funding would occur through a multi-step transaction. First, ADESA would loan money to DAS, some of which would be used to pay TBK and Schiff, with the balance to satisfy other outstanding debt.[26] Next, after satisfying the TBK debt, DAS would file for bankruptcy with ADESA as its senior secured lender. Finally, ADESA would provide additional funding to DAS during its reorganization.[27]

As one of the first steps in this series of transactions, ADESA's December 16, 2016 email specifically asked DAS to obtain written confirmation from TBK of the amount needed to repay its debt and its lawyers' fees (the "**Payoff Letter**").[28] TBK's Payoff Letter executed three days later agreed to release and terminate its security interest in DAS's assets on its receipt of $755,906 and $15,000 to pay its legal fees.[29]

---

[23] Defendants' App. Tab 3 ¶ 30.

[24] Defendants' App. Tab 2, Exs. 18, 19, 23.

[25] *Id*.; Trustee's Ex. A at § 10.1.

[26] Defendant's App. Tab 2, Exs. 18, 19, 20, 24, 25, 26 and 29; App. Tab 12. The email messages reflect different amounts, but as discussed below, they evidence the parties' intent that ADESA's initial advance be used to repay TBK.

[27] *Id.*

[28] Defendants' App. Tab 2, Ex. 39; App. Tab 14.

[29] Trustee's Ex. E [AP No. 51].

MEMORANDUM OPINION                                                                                          **9**

Three days before TBK executed the Payoff Letter, on December 16, 2016, DAS entered into a credit agreement with ADESA (the "**ADESA Agreement**")[30] to borrow up to $1,200,000 in exchange for a security interest in all its assets.[31] ADESA wired $1,070,906 (the "**ADESA Funds**") to DAS's operating account at Branch Banking & Trust Company ("**BB&T**") on December 20, 2016.[32] From that account on the same day DAS wired $15,000 to Schiff (the "**Schiff Transfer**") and $755,906 to TBK (the "**TBK Transfer,**" together with the Schiff Transfer, the "**Transfers**").[33] DAS filed chapter 11 the next day.

### C. The Trustee Sues to Avoid DAS's Prepetition Transfers to the Defendants

The Trustee sued TBK and Schiff to avoid and recover the Transfers as preferential and fraudulent transfers under Bankruptcy Code §§ 547(b) and 548(a)(1). The Defendants' answer asserted defenses, among them that the Transfers were not avoidable because they were made with earmarked funds that a new lender provided.

The Trustee now seeks summary judgment[34] dismissing the Defendants' earmarking defense and finding that the Transfers were "transfers of an interest of the Debtor in property," as both §§ 547(b) and 548(a)(1) require. The Defendants oppose the Trustee's Motion for Summary Judgment and pray for partial summary judgment.

---

[30] Trustee's Ex. B, C [AP No. 51].

[31] *Id. See also* Defendant's App. Tab 13.

[32] Trustee's Ex. D [AP No. 51]. ADESA requested a copy of the Payoff Letter before wiring the ADESA Funds. *See* Defendants' App. Tab 2, Ex. 37 (email from Mr. Coleman to Mr. Higgins, "Tim, Please send us *ASAP* the Triumph acknowledgement that they have been paid in full. Thanks") (emphasis added).

[33] *Id.*

[34] Though the trustee's motion is styled as one for summary judgment, it actually is one for partial summary judgment because it dispenses of only one defense and one element of each of the Trustee's claims. However, motions for summary judgment and partial summary judgment are analyzed under the same standard, so this will not affect the outcome of the issues before the court. *See generally*, Fed. R. Civ. P. 56; *see also Naranjo v. Continental Airlines, Inc.,* 2013 WL 1003485, at *1 (S.D. Tex. Mar. 13, 2013) (acknowledging the language of Rule 56(a) "indicates the availability of a partial motion for summary judgment.").

## III.    JURISDICTION AND VENUE

The District Court for the Northern District of Texas has subject matter jurisdiction over DAS's bankruptcy case and this adversary proceeding under 28 U.S.C. § 1334.  Venue is proper in this district under 28 U.S.C. § 1409.  The claims among the parties are core proceedings under 28 U.S.C. § 157(b)(2)(C), (H) and (O).  The District Court has referred DAS's bankruptcy case and all core and non-core proceedings in the bankruptcy case to this court under the August 3, 1984 Order of Reference of Bankruptcy Cases and Proceedings *Nunc Pro Tunc*.

## IV.    SUMMARY JUDGMENT STANDARD

In deciding a motion for summary judgment, a court must determine whether the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56, made applicable by FED. R. BANKR. P. 7056.  In deciding whether a fact issue has been raised, the facts and inferences drawn from the evidence must be viewed in the light most favorable to the non-moving party.  *Berquist v. Washington Mut. Bank*, 500 F.3d 344, 349 (5th Cir. 2007).  A court's role at the summary judgment stage is not to weigh the evidence or determine the truth of the matter, but rather to determine only whether a genuine issue of material fact exists for trial.  *Peel & Co., Inc. v. The Rug Market*, 238 F.3d 391, 394 (5th Cir. 2001) ("the court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence") (citing *Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S. 133, 135 (2000)).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Pylant v. Hartford Life and Acc. Ins. Co.,* 497 F.3d 536, 538 (5th Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

"After the movant has presented a properly supported motion for summary judgment, the burden then shifts to the nonmoving party to show with 'significant probative evidence' that there exists a genuine issue of material fact." *Hamilton v. Segue Software Inc.,* 232 F.3d 473, 477 (5th Cir. 2000) (internal citation omitted). When parties file cross-motions for summary judgment, the court must review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party. *Green v. Life Ins. Co. of N. Am.*, 754 F.3d 324, 329 (5th Cir. 2014).

## V. LEGAL ANALYSIS

### A. To Avoid a Transfer Under §§ 547 or 548, the Transfer Must Be "of an Interest of the Debtor in Property"

Bankruptcy Code § 547 authorizes a trustee to avoid and recover a debtor's pre-bankruptcy preferential transfers of property. To recover a preferential transfer under 11 U.S.C. § 547(b), the Trustee must prove:

(1) *a transfer of an interest of the debtor in property*;

(2) to or for the benefit of a creditor;

(3) for or on account of antecedent debt;

(4) made while the debtor was insolvent;

(5) made on or within 90 days before the date of the filing of the bankruptcy petition; and

(6) *that enabled the creditor to receive more than it would otherwise have received if the transfer had not been made and the case had proceeded under Chapter 7.*

*Union Bank v. Wolas*, 502 U.S. 151, 154–55, 112 S. Ct. 527, 116 L.Ed.2d 514 (1991) (emphasis added); 11 U.S.C. § 547(b).

Trustees may also recover a debtor's pre-bankruptcy property transfers that were constructively fraudulent.  To prevail on a claim for a fraudulent transfer under Bankruptcy Code § 548(a)(1)(B), the Trustee must prove:

> (1) the transfer was a *transfer of an interest of the debtor in property*;
>
> (2) made within one year of the filing of the bankruptcy petition;
>
> (3) for which the debtor received less than a reasonably equivalent value in exchange for the transfer; and
>
> (4) the debtor was insolvent when the transfer was made or rendered insolvent by the transfer.

11 U.S.C. § 548 (emphasis added).

The Trustee contends that because the ADESA Agreement did not explicitly obligate DAS to use the ADESA Funds to repay TBK, DAS had dominion over the money and with it unfettered discretion to pay any creditor of its choosing.  The Trustee believes these facts are sufficient to negate the Defendants' earmarking defense and show the ADESA Funds became "property of the debtor" for avoidance purposes.  The Defendants, in contrast, argue that the ADESA Funds were earmarked to pay off DAS's debt to TBK, a condition precedent to ADESA's providing post-petition funding to DAS.[35]  Although the Defendants do not dispute that the ADESA Funds were deposited into DAS's bank account before they were transferred to TBK, they argue that the requirement to use the ADESA Funds to repay TBK deprived DAS of the discretion to pay any creditor of its choosing.  Therefore, they argue DAS lacked control over the ADESA Funds before they were transferred to TBK and Schiff.

The Defendants also moved for summary judgment on the Trustee's claims against them. They contend that the ADESA Funds were never property that would have been part of the estate

---

[35] Brief in Support of Defendants' Motion for Summary Judgment [AP No. 53-2] at 20 of 31.

had it not been transferred before the commencement of the bankruptcy. Accordingly, they argue that the Trustee cannot prove an indispensable element for recovery under both §§ 547 and 548: that the transferred property be "of an interest of the debtor in property." They also assert in the alternative that because TBK held a security interest in collateral worth more than DAS's debt to it, its claim was fully secured. As a result, they reason that DAS's pre-bankruptcy transfer of ADESA Funds did not enable TBK to receive more than it would have had DAS liquidated under chapter 7 and so was not a preference under 11 U.S.C. § 547.

### B. The Defendants' Earmarking Defense Bars the Trustee's Avoidance Actions

#### 1. The ADESA Funds were not "an interest in property" of DAS

A trustee cannot use 11 U.S.C. §§ 547 or 548 to recover a third party's money that was used to pay a debtor's creditor before bankruptcy if the debtor had no interest in the property. *See, e.g., Coral Petro. Inc. v. Banque Paribas–London,* 797 F.2d 1351, 1356 (5th Cir. 1986). The Bankruptcy Code does not define the term "interest of the debtor in property" but the Supreme Court has interpreted it as "property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings."[36]

The earmarking doctrine is a judicially created defense to this statutory requirement that a voidable preference or fraudulent conveyance include a transfer of *an interest of the debtor in property*. Where the doctrine applies, the debtor's use of borrowed funds to satisfy a pre-existing debt is not deemed a pre-petition transfer of the debtor's property and therefore is not avoidable as a preference or fraudulent transfer. The theory underlying the defense is that funds a third party

---

[36] *See Begier v. I.R.S.,* 496 U.S. 53, 58, 110 S. Ct. 2258, 2263, 110 L.Ed.2d 46 (1990) (holding that the term "interest of the debtor in property" under 11 U.S.C. § 547(b) is synonymous with the term "property of the estate" under 11 U.S.C. § 541).

advances to a debtor to pay a specific debt never become property of the debtor—they are merely entrusted to the debtor for payment to a creditor.

The doctrine acknowledges that funds may have been in an entity's bank account prepetition yet still beyond its control—and therefore not part of the bankruptcy estate post-petition. *See Coral Petroleum, Inc.*, 797 F.2d at 1356 (Where "a third person makes a loan to a debtor specifically to enable him to satisfy the claim of a designated creditor, the proceeds never become part of the debtor's assets."); *Smith v. Suarez* (*In re IFS Fin. Corp.*), 417 B.R. 419, 435-36 (Bankr. S.D. Tex. 2009), *aff'd*, 669 F.3d 255 (5th Cir. 2012) ("The earmarking doctrine is widely accepted in the bankruptcy courts as a valid defense against a preference claim, primarily because the assets from the third party were never in the control of the debtor and therefore payment of these assets to a creditor in no way diminishes the debtor's estate.").

### 2. DAS did not have control over the ADESA Funds

The first issue in determining whether the Defendants are entitled to the earmarking defense is whether DAS had "control" over the ADESA Funds before they were transferred to TBK and Schiff.

The Defendants argue that the court must consider the "totality of the circumstances" surrounding the transfer in order to determine if the debtor had control over the disposition of funds.[37] The Trustee objects, citing the merger clauses in the agreements and pointing out that the documents lack an explicit provision earmarking the funds for payment of the Defendants. The Trustee also argues that ADESA Agreement § 13.10[38] specifically precluded third parties—

---

[37] Defendants' Reply [AP No. 64] at 6.

[38] The relevant portion of § 13.10 reads:

> Successors and Assigns. This Agreement shall be binding upon the Borrower, the Lender and their respective successors and assigns, and shall inure to the benefit of the Borrower, the Lender and the successors and assigns of the Lender. No other Person shall be a direct or indirect legal beneficiary

including the Defendants—from benefitting from the agreement directly or indirectly.  The Trustee attempts to distinguish the landmark Fifth Circuit case *Coral Petroleum* on these facts, arguing chiefly that *Coral Petroleum*[39] "did not include a single contract that governed what proceeds would be loaned and how such proceeds [could or could not] be used," nor did the underlying loan documents contain merger clauses.[40]

The Trustee's effort to distinguish *Coral Petroleum* is not persuasive for two reasons.  First, the pledge agreements and book entries at issue in *Coral Petroleum* were not ambiguous.  In contrast, the loan documents' ambiguity here necessitated resort to extrinsic evidence.  Second, the absence of a single contract underlying the transaction in *Coral Petroleum* does not govern the outcome here.  *Coral Petroleum* and its progeny[41] continue to emphasize the level of *control* that the debtor exerts over the funds.  They hold that absent an explicit or unambiguous agreement specifying how the proceeds are to be used, courts should focus on the substance of a transaction rather than its form.  *See Coral Petroleum*, 797 F.2d at 1359 (declining to hold the debtor had general control over the funds in its account because to do so would "entirely elevate form over substance"); *Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111, 1116 n.11 (5th Cir. 1995) (citing *In re T.B. Westex Foods, Inc.*, 950 F.2d 1187, 1195 (5th Cir.1992) ("[t]he purpose of

---

of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any of the other Loan Documents

Trustee's Ex. B [AP No. 51].

[39] In *Coral Petroleum*, a subsidiary of the debtor pledged $35,000,000 as collateral for Paribas-Suisse's loan to the debtor.  *Coral Petro. Inc. v. Banque Paribas–London*, 797 F.2d 1351, 1356 (5th Cir. 1986*)*.  The plaintiff committee argued that the funds were "uncontrolled" by the debtor because the subsidiary and the debtor merely had an "understanding" that the funds would be used for a specific purpose.  *Id.* at 1359.  The Fifth Circuit disagreed and held that the payment was not a preference but rather a mere bookkeeping transaction, *id.* at 1360, and that to hold otherwise would "elevate form over substance."  *Id.* at 1359.

[40] Liquidating Trustee's Response [AP No. 62] ("Trustee's Response") ¶¶ 9, 10.

[41] Lower courts that have considered the earmarking defense since *Coral Petroleum* have followed the "substance over form," or totality of the circumstances, approach.  *See e.g., In re Loggins*, 513 B.R. 682, 702 (Bankr. S.D. Tex. 2014) ("The Court must instead look at the entire transaction in order to distill its substance.").

the transfer is not dispositive of the question whether it qualifies as an avoidable preference under

section 547(b) because 'it is the *effect* of the transaction, rather than the debtor's or creditor's *intent*,

that is controlling.'") (emphasis in original).

In implementing the "substance over form approach" to assess claims of the earmarking

defense, the Fifth Circuit repeatedly has considered extrinsic evidence to determine the degree of

debtor's control over the monies allegedly earmarked. *See, e.g., Coral Petroleum,* 797 F.2d 1351

(considering testimony and telexes between the parties to determine whether deposits into the

debtor's general account were subject to restrictions); *In re Entringer Bakeries, Inc.*, 548 F.3d 344,

352 (5th Cir. 2008) (placing significant weight on testimony from loan officers in analyzing

debtor's degree of control over funds deposited into its general operating account). Accordingly,

because the transaction challenged here involves documents with ambiguities, determining the

parties' intent is essential to application of the Fifth Circuit's "control test."

Application of the totality of the circumstances approach to the evidence supports a finding

and conclusion that the parties intended that DAS transfer the ADESA Funds directly to TBK,

notwithstanding ADESA Agreement § 13.10 and the absence of an explicit provision earmarking

the proceeds. An examination of the entire transaction reveals that DAS likewise never had any

control over the $1.2 million but was required to repay TBK with the initial ADESA loan proceeds.

The evidence supporting this includes:

- Defendants' App. Tab 3 – DAS's Motion to use cash collateral [BC No. 10] at ¶ 30 ("On December 19, 2016, DAS and ADESA entered into that certain Promissory Note, Credit Agreement and Security Agreement (collectively, the "ADESA Loan") *pursuant to which* ADESA loaned funds to DAS *for the satisfaction of the Triumph Loan and to fund other expenses of DAS…"*) (emphasis added) – this was DAS's admission that the ADESA Funds were used directly for the repayment to TBK pursuant to the ADESA Agreement.

- Defendants' App. Tab 2, Ex. 18 – November 21, 2016 email from Mr. Higgins ("All, . . . KAR, DAS [DAS] and Triumph spoke last Wednesday and concluded

the call with Triumph agreeing to send out a Joinder draft agreement to KAR for review.  That document was sent out last Friday.  I think everything is in place to go forward with KAR *assuming* a secured creditor position with DAS…") (emphasis added).

- *Id.* at Ex. 32 – November 29, 2016 email from Mr. Stefancin (of Ice Miller, LLP, attorney for KAR) to various parties, including Mr. Coleman (KAR) and Mr. Higgins ("Attached to this e-mail … are drafts of the documents for the loan *from ADESA, Inc. to DAS to take out the Triumph debt*, and provide some capital.") (emphasis added).

- *Id.* at Ex. 31 – November 29, 2016 email from Higgins to Hoyt (of Independent Bankers Capital Fund II LP) ("I have convinced KAR [ADESA] *to buyout triumph* [sic] at full value.  Triumph is ecstatic.  KAR has prepared a loan agreement to fund DAS pre petition.  They will send it to us tomorrow.  Peter[42] made it clear his goal is to become the senior lender so they can fund us this week…") (emphasis added).

- *Id.* at Ex. 39 – December 6, 2016 email from Mr. Coleman to Mr. Higgins ("It is critical that we receive from Triumph a payoff letter today.  Please reach out to your business contact at Triumph and arrange to have that sent to us…").

- *Id*. at Ex. 35 – December 9, 2016 email from Mr. Acosta (of TBK) to Mr. Higgins – ("Today's buyout letter.").

- *Id.* at Ex. 37 – December 20, 2016 email from Mr. Coleman ("Tim, please send us ASAP the Triumph acknowledgement that they have been paid in full. Thanks").

- *Id.* at Ex. 38 – December 19, 2016 email from TBK's counsel to Mr. Higgins and Mr. Stefancin; Subject: TBK/DAS Payoff Letter ("Attached please find the following: 1. Payoff Statement 2. Blackline of Payoff letter 3. Payoff Letter with Equipment Documentation attached.  Please let us know if you need anything further.").

This evidence establishes that the ADESA loan was structured so that TBK's debt had to be satisfied before ADESA would advance additional funds to DAS.[43]  ADESA's receipt of the Payoff Letter as assurance that DAS would direct the ADESA Funds to TBK was essential to

---

[42] Peter Kelly worked for Open Lane, Inc., a company associated with the ADESA/KAR group.  *See* Defendants' App. Tab 2, Exs. 2, 23.

[43] *See e.g.*, Trustee's Ex. B, at § 10.1 (the ADESA Agreement requiring the "Debt to be Repaid" be paid in full before ADESA would provide additional funding).  This parol evidence shows that "Debt" included TBK.

obtain TBK's release of claims against DAS and more importantly, the release of its security interest so that ADESA could take a first lien position in the debtor's assets.

a.    *The ADESA Agreement Obligated DAS to Transfer the ADESA Funds to TBK and Pay Off Its Debt*

The Trustee also argues that once the ADESA Funds were deposited and commingled with other funds in DAS's BB&T account, DAS's unfettered control over the money negated the earmarking defense because DAS could use it to pay other creditors.  He relies on a specific provision in the ADESA Agreement:

> 8.6 [Affirmative Covenants]    Use of Proceeds.  Use the proceeds of the Loans solely for working capital purposes, for Capital Expenditures, for other general business purposes, to repay existing indebtedness and pay  transaction related expenses; and not use or permit any proceeds of any Loan to be used, either directly or indirectly, for the purpose, whether immediate, incidental or ultimate, of "purchasing or carrying" any Margin Stock.[44]

The Trustee ignores evidence conclusively establishing that the ADESA Agreement deprived DAS of dominion over the ADESA Funds.  That evidence leaves no room to dispute that the company had to satisfy the TBK debt to receive continued financing under the ADESA Agreement.  ADESA Agreement § 10 governed the lender's conditions precedent to making the loan.  It recites in relevant part:

> SECTION 10 EFFECTIVENESS; CONDITIONS OF LENDING, ETC.

> The obligation of the Lender [ADESA] to make the Loans is **subject to the following conditions precedent:**

> 10.1 Initial Credit Extension. The obligation of the Lender to make the initial Loans is, in addition to the conditions specified in Section 12.2, subject to the conditions precedent that (a) **all Debt to be Repaid has been (or concurrently with the initial borrowing will be) paid in full, and that all agreement and instruments governing the Debt to be Repaid and that all Liens securing such**

---

[44] Trustee's Ex. B [AP No. 51].

**Debt to be Repaid has been (or concurrently with the initial borrowing will be) terminated, to the best of Borrower's knowledge**. . .[45]

Although "Debt to be Repaid" is undefined, parol evidence established that the debt included the TBK debt. Thus, DAS was obligated to use initial proceeds of the ADESA loan to repay TBK so that ADESA would replace it as DAS's senior secured lender. It is not disputed that ADESA would not extend additional financing unless and until TBK was paid off. Putting substance over form, DAS was a mere conduit to facilitate repayment of the TBK loan; all that really occurred was a substitution of one creditor for another—ADESA for TBK. It is irrelevant that the funds "hit the Debtor's operating account" for approximately forty-five minutes as long as the debt owed to TBK was eliminated.[46] The debtor's estate was not diminished by the transfer.

### b. *Possession alone does not establish "control" for purposes of the earmarking doctrine*

The Trustee's argument that DAS controlled the ADESA Funds because of its momentary possession of the money in its BB&T bank account ignores the Fifth Circuit's holding that *control*, and not simple possession, determines the availability of the earmarking defense and whether funds are property of a debtor for purposes of avoidance actions. *See In re Entringer*, 548 F.3d at 349 (employing the Fifth Circuit's "'*control* test' to determine if a payment was a preference because the money was property of the estate, or if instead the parties 'earmarked' the funds for a particular creditor."). *See also Coral Petroleum*, 797 F.2d at 1356 ("The earmarking doctrine is widely accepted in the bankruptcy courts as a valid defense against a preference claim, primarily because the assets from the third party were never in the *control* of the debtor and therefore

---

[45] App. Tab 2, Ex. 2 (emphasis added).

[46] *See* Defendants' App. Tabs 20- 23; App. Tab 1, ¶ 15; Trustee's Ex. E (DAS received the ADESA Funds in its BB&T account at 1:01 p.m. on December 20, 2016. That same day, DAS remitted the $15,000 payment to Schiff by wire transfer at 1:42 p.m., followed by the payment to TBK at 1:57 p.m.).

payment of these assets to a creditor in no way diminishes the debtor's estate.") (emphasis added); *In re Jazzland, Inc.*, 161 F. App'x 436, 437 (5th Cir. 2006) (unpublished opinion) (in a preference action, funds in the debtor's bank account were properly excluded from the debtor's estate where the debtor's "only position" as to the funds "was to serve as a conduit to pay the money over to Broadmoor upon satisfaction of all contractual conditions," hence it had no interest in the funds "[b]eyond its role as a delivery vehicle").

As the Fifth Circuit noted, "physical control is not the sole indicator of whether the parties earmarked the money for a particular creditor." *Entringer*, 548 F.3d at 350. DAS's agreement with ADESA, which required use of the ADESA Funds to pay the Defendants, limited the debtor's use of the money.

In summary, the earmarking defense applies to the Trustee's avoidance actions because DAS did not retain control over the ADESA Funds used to repay TBK. The transfer of the $755,906.00 from ADESA to Defendants was not a "transfer of an interest of the debtor in property" within the meaning of §§ 547(b) and 548(a)(1). The transaction merely substituted one secured lender for another: it resulted in no diminution in assets available to pay DAS's creditors. Accordingly, the Defendants are entitled to summary judgment.

### C.   *Hypothetical Liquidation Analysis Under § 547(b)*

#### 1.   *TBK's claim against DAS was fully secured*

Assuming for the sake of argument that the Defendants did not make out a case for the earmarking defense, the next issue is whether DAS's payments to them were preferential transfers. To prevail on that claim, the Trustee must prove among other things that the Defendants received more than they would had DAS liquidated under chapter 7 of the Bankruptcy Code. 11 U.S.C. § 547(b). *See also Braniff Airways, Inc. v. Exxon Co., U.S.A.* (*In re Braniff Airways, Inc.*), 814 F.2d

1030, 1034 (5th Cir. 1987) (Trustee bears the burden of proof). The Defendants have moved for summary judgment alleging that the Trustee cannot meet this burden.

Whether the Defendants received a preference depends on whether the transfers enabled them to receive more than the amount of TBK's secured claim. That in turn depends on the value of TBK's collateral. *See* 11 U.S.C. § 506(a) (amount of secured claim limited to value of collateral); *Dewsnup v. Timm*, 502 U.S. 410, 426, 112 S. Ct. 773, 782, 116 L. Ed. 2d 903 (1992) ("An allowed claim of a creditor secured by a lien . . . is a secured claim to the extent . . .") (citing § 506(a)).

The parties do not dispute that TBK held a senior first priority security interest in DAS's accounts and general intangibles as of the date of the Transfers;[47] but they disagree on the value of collateral for TBK's claim.

The Trustee argues that the Defendants were undersecured—that is, that the amount DAS owed them exceeded the value of their collateral—on the date of the Transfers. The Trustee argues that $499,868.05 of DAS's accounts receivable were uncollectible,[48] an issue of disputed material fact for trial, where he claims he will prove that "the collectability of the receivables would have been greatly impacted by a liquidation on the Petition Date and that the Defendants received more than they would have in a hypothetical Chapter 7."[49] The Trustee does not dispute that the chapter 11 debtor collected $736,669.00 of its receivables after filing bankruptcy, but he contends that § 547 demands that the court use the projected value of accounts receivable assuming the debtor liquidated in chapter 7, rather than actual collections. The Trustee maintains that the evidence at

---

[47] Defendants' App. Tab 4.

[48] Trustee's Response ¶ 28. TBK's total debt at the date of filing bankruptcy was $21,701,361.37. [BC No. 89] at 7.

[49] Trustee's Response ¶ 39.

trial would demonstrate that a chapter 7 debtor no longer in business would suffer drastically reduced collections of accounts receivable.[50]

The Defendants insist that TBK was fully secured as of the date of the Transfers. They submitted a DAS accounts receivable aging report into evidence showing the accounts receivable with a value of $1,035,662.25 as of December 19, 2016, two days before the bankruptcy filing.[51] Of that amount, $736,669.00 was *actually* collected post-petition.[52] The Defendants also rely on DAS's Schedule B,[53] which reflects that the debtor's inventory and notes receivable —both subject to TBK's senior security interest—were worth approximately $107,822.79 when the company filed chapter 11. Thus, the Defendants argue, TBK's collateral was worth $953,596.79 on the Petition Date, substantially more than the $770,906.00 in transfers the Trustee hopes to avoid as preferential.

The best evidence of the value of TBK's collateral is the amount of the debtor's accounts receivable actually collected, rather than a hypothetical value. Although the Fifth Circuit has not specifically addressed this issue, its application of the "after-the-fact determination of value" in *Wilson v. First Nat'l Bank, Lubbock Tex. (In re Missionary Baptist Found. of Am., Inc.)*, 796 F.2d 752, 761–62 (5th Cir. 1986) is persuasive.[54] In *Missionary Baptist*, the transferee-bank invoked § 547(c)(2)'s "improvement in position" exception to a voidable preference under § 547(b). *Id.* at 759. The Fifth Circuit declined to conduct an analysis using the face value of the debtor's accounts

---

[50] *Id.* ¶ 35.

[51] Defendants' App. Tab 32 [AP No. 53].

[52] *See* DAS's April 2017 Monthly Operating Report [BC No. 212].

[53] [BC No. 89].

[54] *See also In re Ebbler Furniture & Appliances, Inc.*, 804 F.2d 87, 91 (7th Cir. 1986) (recognizing the Fifth Circuit's "individualized approach in defining value and [the] hindsight solution of the problem" and holding that "under Section 547(c)(5) value should be defined on a case by case basis.").

receivable the day the petition was filed, and instead remanded the case to the bankruptcy court to determine the change in value of the accounts receivable in the ninety day period before the bankruptcy filing. It reasoned that Bankruptcy Code § 506(a)[55] required an "individualized assessment" of the receivables' value when the accounts outstanding on the day of bankruptcy were not or could not be collected in full. *Id.* at 762. The Fifth Circuit also took guidance from a House Committee Report stating that "[c]ourts will have to determine value on a case-by-case basis, *taking into account the facts of each case* and the competing interests in the case." *Id.* at 762 (citing H.R. Rep. No. 595, 95th Cong., 1st Sess. 356 (1977), reprinted in 1978 U.S. Code Cong. & Ad. News 5963, 6312) (emphasis added).

Although *Missionary Baptist* used "after-the-fact" valuation of collateral in applying the ordinary course of business defense under 11 U.S.C. § 547(c)(2), rather than § 547(b)(5), its pragmatic reasoning applies equally here. The evidence of the actual amount of DAS's accounts receivables collected post-petition established the value of the receivables for the purpose of determining the amount of TBK's secured claim.[56] Accordingly, for purposes of the Trustee's preference claim under § 547(b)(5) only, the court finds TBK was fully secured at the time of the Transfers and therefore did not receive a greater percentage of recovery than it would have in a chapter 7 proceeding. Based on this finding, the court need not address the Defendants' *El Paso Refinery* argument.

---

[55] Bankruptcy Code § 506(a) provides in part that the "value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest."

[56] Defendants' App. Tab 4 (stipulation between the Defendants and the Trustee, in which the Trustee does not dispute that DAS's monthly operating reports filed in the bankruptcy case establish that as of April 2017, DAS and ADESA actually collected $736,669.00 in prepetition accounts receivable, all of which served as TBK's pre-petition collateral under the Factoring Agreement). DAS's Monthly Operating Reports for January 2017-April 2017 [BC Nos. 128, 164, 183, 212, respectively].

## VI.    CONCLUSION

The Defendants are entitled to summary judgment on their earmarking defense and each of the Trustee's claims.

Counsel for the parties shall confer on a form of judgment consistent with this ruling, to be submitted within ten days of the entry of this Memorandum Opinion on the docket.  If they cannot reach an agreement, each party shall submit a proposed judgment on or before the tenth day after entry of this Memorandum Opinion on the docket accompanied by an explanation of why the opponent's proposed order is improper.

### # # # END OF MEMORANDUM OPINION # # #